[No. 27067-2-I.   Division One.   December 20, 1991.]

PHANNA K. XIENG, ET AL, *Respondents*, v. PEOPLES
NATIONAL BANK OF WASHINGTON, *Appellant*.

574

*James R. Dickens* and *Miller, Nash, Wiener, Hager & Carlsen,* for appellant.

*David F. Jurca* and *Helsell, Fetterman, Martin, Todd & Hokanson,* for respondents.

COLEMAN, J. — Peoples National Bank of Washington appeals the trial court's award of $388,982.71 in damages to Phanna K. Xieng, claiming that the trial court applied an improper legal standard in finding it had discriminated against Xieng, erred in finding its discrimination had caused Xieng's disability, erred in awarding damages, and erred in awarding fees and costs. Xieng cross-appeals claiming that the trial court erred in failing to apply a multiplier to his contingency fee award. Xieng also requests attorney fees on appeal. We affirm and award respondent attorney fees.

Phanna K. Xieng was born in Cambodia in 1949, the son of well educated, politically prominent parents. He was educated in Cambodia, receiving a Bachelor of Arts degree from Battambang University in 1969, and continued his studies at the Sorbonne in Paris and at the National Institute of Public Affairs and the National Institute of Law in Phnom Penh. As a Cambodian naval officer, Xieng also received training at the French Naval School in Brest, completed a 6-month English language course, and was sent to the United States for advanced military training. Xieng's American military training was conducted in English, prepared him to be an air and sea rescue pilot, and required him to communicate clearly over military radio.

While Xieng was stationed in the United States, the Cambodian government was overthrown by the Khmer Rouge, Xieng's parents and immediate family were killed, and Xieng was released from military training. Unable to return to Cambodia, Xieng traveled, worked, and studied in various places across the United States. Xieng attended classes conducted in English at the Lewis International School in Washington, D.C., where he received a diploma in hotel and restaurant management in 1976; later he worked as a customer service representative for American Airlines in Los Angeles, communicating solely in English with airline customers. Finally, he worked as a manager for

Skipper's Fish and Chowder House in Kirkland, Washington, where he had frequent customer contact.

In 1979 Xieng began working as a vault and payroll teller for Peoples National Bank, hoping to capitalize on his finance and administration background. Xieng was selected to participate in a management training program for minorities which involved almost constant customer contact, and in 1981 Xieng was awarded certificates for successful completion of the program.[1] At the Bank's suggestion, Xieng received English language tutoring, and his tutor viewed Xieng's ability to communicate in English as "dramatically improved". In addition, Xieng successfully passed an American Institute of Banking course in Effective English.

In 1982 Xieng was transferred to a "grade 9" loan coordinator position with the Bank's consumer credit division, a job requiring telephone contact with Bank agents and customers 1½ to 2 hours daily. While working as a loan coordinator, Xieng received positive performance appraisals. Xieng's supervisors noted that Xieng's English communication skills were an area for future improvement, but they did not suggest that Xieng's Cambodian accent interfered materially with his job performance. In fact, several supervisors recommended promotion.[2]

Although the facts were controverted, the trial court found that during most of 1986 Xieng filled in virtually full time as a grade 11 credit authorizer but continued to be paid at the lower level of a grade 9 coordinator. Jeffrey Zabel, a senior lending officer, wrote that Xieng had "demonstrated very accurate and reliable completion of his normal job duties," and Wanda Judd, Xieng's supervisor,

---

[1] Peoples began this program pursuant to an EEOC consent decree settling other employee discrimination charges.

[2] Carla Anderson wrote in 1983 that Xieng was qualified to advance to a lending officer or operations supervisor position and wrote in 1984 that Xieng worked well with staff and customers. In 1985 Debra Tarbuck wrote that she recommended Xieng for a grade 11 credit authorizer position. Also, in 1986 Jeffrey Zabel recommended that Xieng be made a backup lending authorizer.

assured Xieng in the presence of a third person, Mary Lou Turner, that he would "automatically" be promoted to the next credit authorizer position which became available. However, the next promotion went to Gail Mathison, a credit card collector with no previous lending experience.

In spite of his positive evaluations, Xieng's frequent applications for advancement were denied. On one occasion, managerial level supervisor Jerome Klavuhn threw Xieng's application for a promotion into his wastebasket as soon as Xieng left his office. Later, Bank officer Ken Taylor told Xieng he would be promoted only if he could persuade everyone in Seattle's Cambodian community to become Bank customers. After Xieng explained that he could not guarantee such a thing, his application for promotion was denied. Managerial level employee Linda Sincoff told Xieng he was not being promoted because he could not speak "American".

Beginning in 1985 after several years of being passed over for promotions for which he was qualified, Xieng began suffering severe emotional distress and depression which suppressed his autoimmune system and made him susceptible to chronic active hepatitis, Sjogren's Syndrome, and the Epstein-Barr virus. His emotional and physical problems led to absenteeism, causing the Bank to take disciplinary action against him. By August 1987 Xieng had become fully disabled and was unable to work.

Xieng filed a complaint under RCW 49.60.180 in November 1986 alleging that by failing to promote him, the Bank had discriminated against him on the basis of his Cambodian national origin. The Bank took the position that Xieng's complaint was "frivolous, unreasonable, groundless, and . . . brought in bad faith." Following a bench trial, the trial court found that the Bank had discriminated against Xieng, that its discrimination was the cause of Xieng's disability, and that Xieng was entitled to damages, attorney fees, and costs. The Bank appeals. Xieng cross-appeals from the trial court's failure to apply a multiplier to the attorney fees awarded at trial and requests attorney fees on appeal.

We initially consider whether the trial court applied an improper legal standard in finding that the Bank had committed national origin discrimination against Phanna K. Xieng.

■ RCW 49.60.180(3) prohibits national origin discrimination. Because our courts have yet to address a national origin discrimination claim based on accent discrimination, we look to the relevant federal cases and regulations. *See Fahn v. Cowlitz Cy.*, 93 Wn.2d 368, 375-76, 610 P.2d 857, 621 P.2d 1293 (1980).

■■ National origin discrimination includes discrimination against an employee because he shares the "linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1 (1991). A plaintiff makes out a prima facie case of national origin discrimination by showing:

> (1) that he has an identifiable national origin; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that he was rejected despite his qualifications; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Fragante v. City & Cy. of Honolulu*, 888 F.2d 591, 595 (9th Cir. 1989), *cert. denied*, 494 U.S. 1081, 108 L. Ed. 2d 942, 110 S. Ct. 1811 (1990). After the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence that the employee was rejected for a "legitimate, nondiscriminatory reason." *Texas Dep't of Comm'ty Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). If "the employer presents legitimate reasons for plaintiff's non-selection, the burden shifts to the plaintiff" to show that the proffered reason was a pretext. *Fragante*, at 595. *Accord, Curtis v. Clark*, 29 Wn. App. 967, 969, 632 P.2d 58 (quoting *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 54-55, 573 P.2d 389 (1978) (discussing the shifting burdens of proof in an action brought under RCW 49.60)), *review denied*, 96 Wn.2d 1009 (1981).

■ In *Fragante*, a job applicant with a heavy Filipino accent was denied employment because of his deficient oral

communication skills. *Fragante*, at 593-94. Although the Ninth Circuit found the job applicant's accent to be a legitimate, nondiscriminatory reason for his nonselection, the court noted the heavy burden employers must meet in accent discrimination cases. The court stated that because employers could easily use an individual's foreign accent as a pretext for national origin discrimination, courts must take a "very searching look" at adverse employment decisions based upon claims of deficient oral communication skills. *Fragante*, at 596. The Ninth Circuit concluded that "[a]n adverse employment decision may be predicated upon an individual's accent when — but only when — it interferes *materially* with job performance." (Italics ours.) *Fragante*, at 596. Thus, under *Fragante*, employers may claim that an employee's foreign accent is a legitimate reason for nonpromotion only if that accent interferes materially with job performance.

The Bank asserts that this court should disregard the *Fragante* standard and adopt a "good faith belief " standard. Under this proposed standard, denial of promotion because of a foreign accent would not be national origin discrimination if:

> (1) the ability to . . . speak English is a job requirement; (2) the employee has documented difficulties with the English language; and (3) the employer has a *good faith belief* that . . . lack of communication skills would materially interfere with job performance.

(Italics ours.) Brief of Appellant, at 26-27.

The Bank supports adoption of this new standard by citing to three cases, but each case is factually distinguishable and uses a standard similar to the "legitimate nondiscriminatory reason" standard of *Fragante*.[3] In addition,

---

[3] In *Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 280-81 (11th Cir. 1989), the court found that an employee's inability to speak and *understand* English causing misdelivery of supplies was a legitimate nondiscriminatory reason for discharge. In *Hou v. Pennsylvania Dep't of Educ.*, 573 F. Supp. 1539, 1549 (W.D. Pa. 1983), the court held that a foreign-born professor's lack of teaching effectiveness was a legitimate nondiscriminatory reason to deny promotion. In *Casas v. First Am. Bank*, 31 Fair Empl. Prac. Cas. 1479, 1480-82

because a subjective "good faith belief" that a foreign accent interferes with job performance could easily become a refuge for unlawful national origin discrimination, the "good faith belief" standard is inconsistent with the heavy burden *Fragante* places on employers in accent discrimination cases. Accordingly, we decline to adopt the Bank's proposed "good faith belief" standard and hold that the lower court properly applied the *Fragante* "legitimate nondiscriminatory reason" standard in reviewing the Bank's failure to promote.[4]

The Bank next alleges that the trial court erred in finding national origin discrimination because the court improperly presumed the Bank's reason for nonpromotion was discriminatory. However, the Bank cites no evidence showing that the trial court applied an improper presumption. The burden of proof remained with Xieng at all times. In light of all the evidence, the trial court concluded that refusing to promote Xieng because of his Cambodian accent amounted to national origin discrimination because Xieng's accent did not interfere *materially* with his job performance. In essence, the trial court found that Xieng had met the burden of showing that the Bank's proffered "legitimate nondiscriminatory reason" was not worthy of credence. *See Fragante*, at 595 (pretext established by showing that "the employer's proffered reason is unworthy of credence.").

■■ Finally, the Bank asserts that the trial court erred in finding national origin discrimination because the Bank had legitimate nondiscriminatory reasons for failing to promote and because the court's finding that Xieng was quali-

---

(D.D.C. 1983), an employee's lack of qualifications for the position, lack of attention to detail, errors in bank transfers resulting in financial losses, lack of supervisory experience, poor communication skills, and uncooperative attitude were legitimate nondiscriminatory reasons for lack of promotion.

[4]Although *Fragante* states that "[t]here is nothing improper about an employer making an *honest* assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance", the employer's honest assessment must have "a factual basis". *Fragante*, at 596-97. Good faith alone is not enough.

fied for promotion was not supported by substantial evidence. In reviewing whether substantial evidence supports the trial court's findings of fact, this court determines "whether the evidence most favorable to the prevailing party supports the challenged findings." *State v. Black*, 100 Wn.2d 793, 802, 676 P.2d 963 (1984). A trial court's interpretation of disputed testimony must be upheld when any reasonable view supports its findings, "even though there may be other reasonable interpretations." *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 501, 663 P.2d 132, *review denied*, 100 Wn.2d 1005 (1983). In addition, the reviewing court "may not usurp the functions of the judge . . . and reverse the judgment because the weight of testimony seems to be on the other side, or because . . . the judge believed some witnesses and disbelieved some others." *Papac v. Mayr Bros. Logging Co.*, 1 Wn. App. 33, 36, 459 P.2d 57 (1969).

In this case there was substantial evidence to support the trial court's view that the Bank's reason for nonpromotion was not worthy of credence. Xieng had received many positive job performance evaluations and up until the time of filing his discrimination claim had been recommended for promotion. Although the Bank had documented evidence that Xieng's accent could be improved, employees testified that they did not consider his accent to interfere materially with his work. In fact, he was complimented on his accuracy and attention to detail, his pleasant manner, and his ability to work well with Bank employees and customers. In addition, there was substantial evidence to support the trial court's view that Xieng was qualified to be a credit authorizer. The fact that Xieng had been filling in at that position off and on for 2 years and had virtually occupied the position for 8 months prior to his lack of promotion indicates that he was qualified. Thus, the trial court's findings of fact do not amount to an abuse of discretion, and the court's ruling that the Bank discriminated against Xieng on the basis of national origin is supported by substantial evidence.

We next decide whether the trial court finding that the Bank's discrimination caused Xieng's emotional and physical disability was supported by substantial evidence.

■ ■ To establish causation between a defendant's wrongful acts and a plaintiff's injuries the medical testimony must be convincing enough to remove the issue from the realm of speculation and conjecture. *O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). As a result, the testimony

> must be sufficient to establish that the injury-producing situation "probably" or "more likely than not" caused the subsequent condition, rather than that the accident or injury "might have," "could have," or "possibly did" cause the subsequent condition.

*Merriman v. Toothaker*, 9 Wn. App. 810, 814, 515 P.2d 509 (1973) (citing *Ugolini v. States Marine Lines*, 71 Wn.2d 404, 407, 429 P.2d 213 (1967)). A defendant is liable for all damages proximately caused, including damages arising out of a preexisting condition, if there is no evidence that the preexisting condition was causing pain or disability before the occurrence. *Bennett v. Messick*, 76 Wn.2d 474, 478-79, 457 P.2d 609 (1969).

Medical testimony by Xieng's psychiatrist, Dr. Maurice Lustgarten, demonstrated a causal relationship between the Bank's national origin discrimination and Xieng's severe emotional distress and depression. Dr. Lustgarten stated that in his opinion it was reasonably certain that events at the Bank "lit up" Xieng's preexisting posttraumatic stress disorder, which arose from the loss of his country and family. In addition, Xieng's physician, Dr. John Baldwin, testified that Xieng's emotional condition "more likely than not" aggravated his symptoms of Sjogren's Syndrome and chronic active hepatitis. Another of Xieng's physicians, Dr. Bang D. Nguyen, testified that Xieng's physical problems were "more likely than not" caused by the depression of his body's immune system due to emotional distress. Based on this testimony, the trial court found that Xieng had met the

burden of proving that his emotional and physical disability was caused by the Bank's discrimination.

The Bank asserts that the evidence does not support the trial court's finding of causation. However, in view of the heavy burden placed on reviewing courts which address whether substantial evidence supports a trial court's finding of fact, see discussion, *supra*, we conclude that the trial court did not abuse its discretion in finding that the Bank's failure to promote caused Xieng's disability. The trial court's finding is reasonably supported by Xieng's medical experts' testimony.

We next consider whether the trial court erred in calculating Xieng's award of damages because it awarded front pay, awarded back pay, and refused to deduct Xieng's disability insurance settlement from the damage award.

■ ■ The Bank first asserts that the trial court erred in awarding 5 years of front pay as a part of Xieng's damage award. RCW 49.60.030(2) permits a plaintiff to recover "actual damages" for national origin discrimination. Actual damages include "damages for injury in fact, as distinguished from exemplary, nominal or punitive damages." *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 58, 573 P.2d 389 (1978). Front pay is a type of actual damages awarded in Title 7 employment discrimination suits which compensates victims "for the continuing *future* effects of discrimination[.]" *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1278 (10th Cir. 1988). The cutoff date for an award of front pay is within the trial court's discretion. *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984).

Dr. Lustgarten testified that Xieng's emotional problems could be cured after 3 years of therapy and that Xieng's physical health could subsequently improve. The Bank presented no evidence to the contrary, and at the conclusion of trial the court found that Xieng's disability will probably continue for another 5 years. Given this finding, the trial court could properly award 5 years of front pay on the basis that it would take Xieng 5 years to recover fully from the continuing effects of the Bank's discrimination.

■ The Bank next asserts that the trial court erred in awarding back pay because the Bank had laid off more than 300 people and the position Xieng had been seeking was eliminated in 1988. However, a "general reduction in the workforce . . . is not a valid defense . . ." to such a claim. *See Sims v. Mme. Paulette Dry Cleaners*, 638 F. Supp. 224, 233 (S.D.N.Y. 1986) (reduction in force not valid defense to award of front pay). Further, to avoid liability for lost wages after elimination of the sought-after position, the employer has the burden of proof to establish that the employee "would not have been retained in some other capacity." *Archambault v. United Computing Sys., Inc.*, 786 F.2d 1507, 1515 (11th Cir. 1986). Because the Bank offered no proof that Xieng would not have been retained in some other capacity, its argument that Xieng may not recover back pay for the period after the reduction in force fails.

■ ■ The Bank finally asserts that the trial court erred by refusing to deduct Xieng's disability insurance settlement from the damage award. The collateral source rule provides that "[b]enefits received by a plaintiff from a source collateral to the [wrongdoer] . . . may not be used to reduce [the wrongdoer's] liability for damages." *Hayes v. Trulock*, 51 Wn. App. 795, 803, 755 P.2d 830, *review denied*, 111 Wn.2d 1015 (1988). Disability payments have been held to arise from a collateral source in some circumstances and not in others. In *Smith v. Office of Personnel Mgt.*, 778 F.2d 258, 263 (5th Cir. 1985), *cert. denied*, 476 U.S. 1105 (1986), the Fifth Circuit held that disability payments paid by the plaintiff's former employer, the United States government, were not from a collateral source and could be set off from the damage award. In contrast, the court implied that disability payments by a third party payor would be from a collateral source and could not be set off. *Smith*, at 263. In addition, in *Clark v. Burlington Northern, Inc.*, 726 F.2d 448, 450-51 (8th Cir. 1984), disability benefits paid under a general employer fringe benefit plan were held to be collateral and were not set off against the wrongdoer/employer's damage award.

Here, Xieng received a $20,000 lump sum disability payment from a Safeco insurance policy, so the *Smith* requirement that disability payments come from a third party payor to be from a collateral source has been met. In addition, the record is consistent with the conclusion that the disability benefits provided by the Bank were part of its general employee compensation package. Thus, *Smith* does not prohibit application of the collateral source rule, and *Clark* provides that application of the collateral source rule is appropriate in this context. The trial court properly ruled that Xieng's disability benefits should not be set off against his damage award.

We next determine whether the trial court erred in finding that the requested attorney fees were reasonable and erred in awarding costs for expert witness fees.

The Bank first avers that because the number of hours spent by Xieng's counsel preparing for trial was unreasonably high, the court erred in finding that the attorney fees were reasonable. The reasonableness of an award of attorney fees involves "a question of fact to be answered in light of the particular circumstances of each individual case," *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 169, 795 P.2d 1143 (1990), and "[t]he reasonableness of an award is subject to appellate review." *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989). However, a "trial court's determination of what constitutes a reasonable award will not be reversed absent an abuse of discretion." *Allard*, at 148.

Attorney fees were calculated at trial by using the "lodestar" formula adopted in *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983). Under *Bowers*, a trial court identifies the number of documented hours reasonably spent in litigation by each attorney, multiplies each attorney's contribution by his or her individual hourly fee, and adds the results to calculate total attorney fees. *Bowers*, at 597-98. Xieng presented testimony that counsel expended 625.1 hours preparing for litigation and presented affidavits from three attorneys who attested to

the reasonableness of the hours expended. Although the Bank presented testimony to the contrary, the court was not required to adopt its view. The record shows that Xieng's employment discrimination claim involved many legal issues and that Xieng's accent discrimination case is a case of first impression in this jurisdiction. In light of these factors and the length of the record below, the trial court did not abuse its discretion in finding that the number of hours expended by Xieng's attorneys was reasonable.

█ The Bank next asserts that the trial court erred in awarding costs for expert witness fees under RCW 49.60.030. RCW 49.60.030(2) provides that discriminatees may recover actual damages "together with the cost of suit[.]" In *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 736, 709 P.2d 799 (1985), the Supreme Court analogized from precedent under RCW 4.84.030 and concluded that expert witness fees were not "costs of suit" under RCW 49.60.030(2). However, in *Blair v. WSU*, 108 Wn.2d 558, 564, 573, 740 P.2d 1379 (1987), the Supreme Court noted that it had not previously decided the scope of costs under RCW 49.60, looked to federal authority for direction, and concluded that recovery of expert witness fees as "costs of suit" under RCW 49.60.030(2) was consistent with policies furthering enforcement of civil rights statutes. In *Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 447, 810 P.2d 952, 815 P.2d 812 (1991), the Court of Appeals recognized that "[w]hile the failure of the *Blair* court to mention the *Shannon* case is puzzling, it is implicit in the reasoning of the *Blair* court that *Shannon* has been overruled *sub silentio*." In light of *Blair* and *Pannell*, the trial court did not err in awarding costs for expert witness fees under RCW 49.60.030(2).

Finally, we decide whether the trial court erred in failing to apply a multiplier to Xieng's award of attorney fees and whether Xieng is entitled to attorney fees for the costs of defending this appeal.

On cross appeal Xieng alleges that the trial court erred in failing to apply a multiplier to the lodestar amount of attorney fees in light of the attorneys' contingency risk. *Bowers* permits adjustment to the lodestar amount to compensate attorneys for the risk "that the litigation would be unsuccessful and that no fee would be obtained'." *Bowers*, at 598-99 (quoting *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980)). However, adjusting the lodestar is within the trial court's discretion, *see Bowers*, at 598, and a presumption exists that the lodestar amount represents a "reasonable fee". *Pennsylvania v. Delaware Vly. Citizens' Coun. for Clean Air*, 483 U.S. 711, 728, 97 L. Ed. 2d 585, 107 S. Ct. 3078 (1987). In addition, the United States Supreme Court recently disfavored lodestar enhancements to reflect an attorney's contingency risk, noting that enhancements "should be reserved for exceptional cases where the need and justification . . . [are] readily apparent[.]" *Delaware*, at 728, 717-31 (reversed lower court's upward adjustment of the lodestar).

Xieng presented affidavits by three attorneys to support his view that local attorneys "commonly refuse contingent fee cases unless they stand to recover at least twice their normal hourly fee". Brief of Respondent, at 47. However, the trial court was not required to adopt this view. In light of the applicable law and the amount of attorney fees awarded at trial, we cannot say that the court abused its discretion in failing to award a multiplier.

Xieng next requests an award of attorney fees and expenses on appeal pursuant to RCW 49.60.030(2), which provides that discriminatees may recover actual damages "together with the cost of suit". It is the general principle in Washington that those entitled to an award of attorney fees below are also entitled to attorney fees on appeal. *See Pannell*, at 449-50 (awarding attorney fees on appeal under RCW 49.60.030(2)). Therefore, we award Xieng reasonable attorney fees on appeal.

The trial court judgment is affirmed. Costs and attorney fees are awarded to Xieng subject to compliance with RAP 18.1(d).

WEBSTER, A.C.J., and AGID, J., concur.

Review granted at 119 Wn.2d 1001 (1992).