Connie F. JOHNSON, Plaintiff,

v.

**GOODYEAR TIRE & RUBBER CO., Defendant.**

**No. CS–91–003–FVS.**

United States District Court,
E.D. Washington.

March 31, 1992.

---

Ross P. White and Gregory W. Westbrooks of Layman, Loft, Arpin & White, Spokane, Wash., for plaintiff.

D. Roger Reed and Michael J. Casey of Reed & Giesa, Spokane, Wash., and by

Robyn L. Crane, Cumberland, Md., pro hac vice, for defendant.

## OPINION

VAN SICKLE, District Judge.

### INTRODUCTION

Connie F. Johnson filed this action against Goodyear Tire & Rubber Co., her former employer. She alleges that Goodyear violated both the Washington Administrative Code (WAC) and its own policies by refusing to allow her to return to her former position after she completed a pregnancy leave; that Goodyear violated RCW 49.60.180(2) by eliminating her position and laying her off; and that her discharge was tortious because it violated established public policy.[1]

This action was originally filed in Spokane County (Washington) Superior Court, but was removed to federal court by Goodyear. 28 U.S.C. § 1441. Jurisdiction is based upon diversity of citizenship. 28 U.S.C. 1332. Venue is not contested. 28 U.S.C. § 1391(a).

### FINDINGS OF FACT

Based upon the stipulation of counsel[2] and the evidence presented at trial, the Court makes the following findings of fact:

1. Mrs. Johnson first began work for Goodyear on September 12, 1977 as a B–50 clerk.*

2. Mrs. Johnson worked part-time as a B–50 clerk for approximately two years before being transferred to the Goodyear Truck Center full-time as a B–50 clerk.*

3. Shortly after receiving her five-year pin from Goodyear, she was laid off because Goodyear closed the Truck Center.*

4. After being laid off for approximately one and one half years, she was called back to Goodyear as a telephone sales coordinator.*

---

1. Mrs. Johnson had also alleged negligent infliction of emotional distress. That claim was dismissed by agreement of the parties at the hearing on Goodyear's motion for summary judgment.

2. Prior to trial, the parties agreed upon a number of facts. (Pretrial Order (Ct.Rec. 28) at pp. 2-4.) Those facts are marked with an asterisk.

5. She continued to work in telephone sales with Goodyear until being laid off once again on April 20, 1985.*

6. In August 1986, she received a phone call from Goodyear asking if she would be interested in an office manager position at the Commercial Tire Center.*

7. She accepted the position and started work in October 1986.*

8. She received sales management and office management training from Goodyear, consisting of a Retail Sales Management School in Los Angeles, California, and a three-day computer school in Oakland, California. She also received office management training in Akron, Ohio.*

9. On August 28, 1987, Mrs. Johnson met with her supervisor, Kelly Gunkel, to discuss her taking pregnancy leave.*

10. At that time, Mrs. Johnson was pregnant with her first child.*

11. Gunkel reviewed with her Goodyear's policy regarding pregnancy leave.*

12. This policy provides in part that:
It is the manager's responsibility to keep informed of the status of each employee on disability leave by maintaining regular contact, including personal visits when appropriate....
... If it is necessary to fill the employee's position during her absence, it will be filled by a temporary employee, whether or not the employee has indicated an intention to return to work.*

13. Mrs. Johnson returned to her position as office manager following the birth of her first child.*

14. Prior to taking her first pregnancy leave, Mrs. Johnson received a positive performance evaluation and a merit pay increase for her work in 1987.*

15. Mrs. Johnson received another positive performance evaluation and another merit pay increase in 1988.*

16. In January 1989, Dave Sturgis replaced Kelly Gunkel as the manager of the Commercial Tire Center ("Tire Center").*

17. At a point some time in late January or early February, Mrs. Johnson was asked to meet with Dave Sturgis and Jim Donaldson regarding her taking another pregnancy leave.* Jim Donaldson was Dave Sturgis' superior at that time.

18. In this meeting, Mrs. Johnson told Donaldson and Sturgis of the problem she was having with her pregnancy, and that her doctor advised her to stop working for the duration of her pregnancy.*

19. Mr. Sturgis suggested to Mrs. Johnson, during a meeting which occurred shortly before her leave of absence, that she consider staying home with her children instead of returning to work at Goodyear.

20. Neither Dave Sturgis nor Jim Donaldson promised Mrs. Johnson she would have the same job when she returned from her pregnancy leave.

21. Mrs. Johnson trained Dan Zyph for approximately two weeks before taking her leave. Mrs. Johnson started her leave on February 15, 1989.*

22. Dan Zyph had transferred to Spokane Commercial Tire Center on August 1, 1989.*

23. Zyph lost that position after several months; however, he continued to work at the Tire Center without specific job duties.*

24. Connie Johnson came into the store to pick up her pay checks while she was on maternity leave.*

25. By the time Mrs. Johnson completed her pregnancy leave, Dave Sturgis had decided to retain Dan Zyph as the office manager of the Tire Center. That decision was based upon the functions which Mr. Zyph could perform. Besides being a competent office manager, he had demonstrated the ability to handle strenuous physical tasks and sell merchandise.

26. When Mrs. Johnson called Dave Sturgis to notify him she was ready to return to work, he told her he was not sure Goodyear had a job for her in the Tire Center at that time. He advised her to call Jim Donaldson.

27. When Mrs. Johnson was unable to reach Mr. Donaldson, she contacted Howard Christman, who was then the manager of all Goodyear Tire Centers in Goodyear's

western region. After reassuring Mrs. Johnson that a position would be found for her, Mr. Christman called Jim Donaldson. Mr. Christman did not promise Mrs. Johnson a specific job.

28. Shortly thereafter, Jim Donaldson, Dave Sturgis, Ron Anderson (who was the regional manager of Goodyear's Human Resources Division), and Dick Baxter (who was a regional Tire Sales Manager) conferred by telephone in order to find a position for Mrs. Johnson.

29. Goodyear operates a retread plant in the same complex which houses its Commercial Tire Center in Spokane. Prior to July of 1989, the retread plant had not had an office manager of its own. The manager of the plant, Wayne Dawson, completed the paperwork generated within the retread plant, although he received some assistance from the office manager for the Tire Center.

30. After conferring with Messrs. Anderson and Baxter, Jim Donaldson and Dave Sturgis decided Mrs. Johnson would be employed as the office manager of the retread plant.

31. Wayne Dawson was not consulted by Goodyear officials prior to the decision to employ Mrs. Johnson as the office manager of the retread plant.

32. Goodyear's Jim Donaldson phoned Connie Johnson and told her to get in touch with Dave Sturgis who would have something for her.*

33. Mrs. Johnson returned to work on July 10, 1989.*

34. She was advised by Sturgis on that day that she would now be working as the office manager at the retread plant.*

35. Mrs. Johnson's first paycheck showed her pay at an hourly rate lower than her previous salary. This matter was corrected when she received her second paycheck.*

36. The financial records of the Goodyear Truck and Tire Center show that Mrs. Johnson was being paid by the Tire Center, as opposed to the retread plant.*

37. Mrs. Johnson's supervisor was Wayne Dawson. He reported to Dave Sturgis.

38. The retread plant has been unprofitable since its inception, including Mrs. Johnson's tenure as the office manager.*

39. To make the Tire Center profitable, Dave Sturgis needed to increase the production and sale of retread tires. He believed that employing an office manager in the retread plant would relieve Wayne Dawson of the need to perform clerical tasks. Freed of that obligation, Wayne Dawson would have more time to spend producing retreads.

40. Prior to July 10, 1989, Wayne Dawson did not spend more than twenty percent of his time performing clerical tasks. Hiring an office manager for the retread plant did not result in significantly greater tire production.

41. The retread plant did not generate enough clerical work to keep Mrs. Johnson busy all day. To fill in, she assisted Dan Zyph with projects in the Tire Center, although he was not her supervisor.

42. At all times material to this action, the Tire Center (including the retread plant) required only one office manager to function effectively.

43. As the office manager of the retread plant, Mrs. Johnson was much more likely to be laid off as a result of a reduction in force than she had been as the office manager of the Tire Center.

44. The Tire Center is open for business five and one-half days per week. Employees in management (which includes office managers) take turns working Saturdays.

45. At the time Mrs. Johnson returned to work, a person by the name of Lane Bibb was employed as an assistant manager in the Tire Center. Although he was not her supervisor, he ordered Mrs. Johnson to work every Saturday. She appealed to Dave Sturgis, who referred her back to Mr. Bibb.

46. Approximately one month after her return, Lane Bibb began to have Mrs. Johnson perform tasks which required her to move and lift tires. Because of a pre-

existing back condition, Mrs. Johnson found it difficult to do such work.

47. Lane Bibb was transferred on September 15, 1989, and his position was not filled. After Mr. Bibb left the Tire Center, Mrs. Johnson was no longer required to work every Saturday.

48. Wayne Dawson knew Mrs. Johnson had a back condition, and instructed her not to lift heavy objects.

49. Both office manager positions required comparable proficiency in clerical skills such as bookkeeping, data processing, and filing.

50. Goodyear allowed Dave Sturgis to modify job descriptions in order to accomplish business objectives.

51. Neither office manager ever had supervisory authority over other employees.

52. During 1989, the Tire Center lost in excess of three hundred thousand dollars. By December, Dave Sturgis' superiors were putting substantial pressure on him to reduce losses by cutting expenses.

53. After consulting with Mr. Donaldson, Mr. Sturgis decided to abolish Mrs. Johnson's position.

54. On December 22, 1989, Mrs. Johnson was advised by Dave Sturgis that she was going to be laid off.*

55. Mrs. Johnson was discharged on December 27, 1989.*

56. The fact Mrs. Johnson took a pregnancy leave was not a substantial factor in Mr. Sturgis' decision to abolish her position.

57. Dan Zyph was subsequently called into active military duty.*

58. After returning from active duty, Dan Zyph was reinstated as office manager of the Tire Center.*

59. Goodyear has never hired another office manager for the retread plant.*

**CONCLUSIONS OF LAW**

*1. Violation of Administrative Regulation*

The State of Washington prohibits an employer from discriminating against an employee on the basis of sex. RCW Ch. 49.60. *See Shannon v. Pay 'N Save Corp.*, 104 Wash.2d 722, 730–31, 709 P.2d 799 (1985). That prohibition exists, in part, to equalize employment opportunities between men and women. WAC 162–30–020(2).

To clarify an employer's responsibilities under RCW Ch. 49.60, the Washington State Human Rights Commission promulgated WAC 162–30. That regulation explains how the law against discrimination "applies to practices which disadvantage women because of pregnancy or childbirth." WAC 162–30–020(2).

In promulgating the regulation, the Human Rights Commission determined that practices which impair a woman's employment opportunities because of pregnancy are discriminatory. WAC 162–30–020(1). As a result, the Commission adopted the following requirement:

> An employer shall allow a woman to return to the same job, or a similar job of at least the same pay, if she has taken a leave of absence only for the actual period of disability relating to pregnancy or childbirth. Refusal to do so must be justified by adequate facts concerning business necessity.

WAC 162–30–020(5)(c).

a. Similar Job

Goodyear concedes Mrs. Johnson was not allowed to return to her former position when she completed her pregnancy leave. Instead, she was reassigned as the office manager of the retread plant. Consequently, the Court must decide whether her new position was a "similar job of at least the same pay."

WAC 162–30 does not define the term "similar job," nor has any Washington appellate court done so.[3] Since it is a

---

**3.** In *California Federal Savings and Loan Ass'n v. Guerra*, 479 U.S. 272, 280–92, 107 S.Ct. 683, 689–95, 93 L.Ed.2d 613 (1987), the Supreme Court upheld Cal.Gov't Code § 12945(b)(2), a

California statute which requires an employer to reinstate a woman who takes a pregnancy leave of four months or less. Regulations enacted to clarify § 12945(b)(2) provide that a

nontechnical statutory term, it may be given its dictionary meaning. *See State v. Fjermestad,* 114 Wash.2d 828, 835, 791 P.2d 897 (1990); *Sunnyside v. Fernandez,* 59 Wash.App. 578, 581, 799 P.2d 753 (1990).[4] Thus, two jobs are "similar" if "nearly but not exactly the same or alike; having a resemblance." *Webster's New World Dictionary* 1250 (Third College Edition 1988).

■ Mrs. Johnson's new job paid the same wage and required many of the same skills. To that extent, it was nearly the same as her former position. It differed in one crucial respect, however. It was much less secure.

Prior to taking her pregnancy leave, Mrs. Johnson was the office manager of the Tire Center. The functions which she performed in that capacity were essential to the Center's operation. As a result, her job was comparatively secure notwithstanding the fact she was terminable at will.

Mrs. Johnson's status at the Tire Center changed dramatically when she was reassigned. The retread plant could function effectively without an office manager. Thus, her new position was of marginal importance. That fact was especially significant given the magnitude of the Tire Center's losses. Because it was losing so much money, the Tire Center simply could not afford to retain an office manager in the retread plant.

It is true that Jim Donaldson and Dave Sturgis hoped that assigning Mrs. Johnson to the retread plant would enable Wayne Dawson to devote more time to tire production. They theorized that an increase in tire production would spur business growth. They did not consult Wayne Dawson, however. Had they done so, they would have learned Mr. Dawson spent no more than twenty percent of his time performing functions which could be shifted to an office manager. That amount of time was not sufficient to lead to a significant increase in retread production.

Goodyear denies that job security is a material criterion for comparing the similarity of the two positions. It argues that the comparison should be based upon the skill, effort, and responsibility required to perform each job. As authority for that proposition, it cites *Adams v. University of Washington,* 106 Wash.2d 312, 722 P.2d 74 (1986), a case in which the state equal pay statute was at issue. Since the legislative history of the statute provided little guidance, the parties urged the Court to examine the federal Equal Pay Act of 1963. *Id.* at 317–18, 722 P.2d 74. It did so, noting that the federal act prohibited an employer from paying different wages to employees of the opposite sex " 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Id.* at 318, 722 P.2d 74 (quoting 29 U.S.C. § 206(d)(1) (1982)).

In *Adams,* the parties stipulated that employees of the opposite sex were performing substantially similar work, but were being paid different wages. *Id.* at 318–19, 722 P.2d 74. Because of that stipulation, the Washington Supreme Court did not have to decide whether the jobs were similar. Nevertheless, Goodyear argues that the factors listed in 29 U.S.C. § 206(d)(1) are the most important criteria for deciding whether the position to which Mrs. Johnson was assigned was similar to her former job.

woman is entitled to her original job unless the position no longer exists, or the means necessary to preserve the job for her "would substantially undermine the employer's ability to operate the business safely and efficiently." Cal. Code Regs. tit. 2, § 7291.2(d)(3)(C)(1) (1992). If she is not reinstated in her former position, the employer must provide her with "a substantially similar job." Cal.Code Regs. tit. 2, § 7291.-2(d)(3)(C)(2) (1992). A "substantially similar job" is one which is "substantially similar to [her] original job in all respects, including but not limited to its essential duties, compensation, employee benefits, hours, opportunities for advancement and all other working conditions." Cal.Code Regs. tit. 2, § 7291.2(a)(11) (1992).

4. The rules of statutory construction apply to the interpretation of an administrative regulation. *Multicare Medical Center v. Department of Social and Health Services,* 114 Wash.2d 572, 591, 790 P.2d 124 (1990); *State v. Burke,* 92 Wash.2d 474, 478, 598 P.2d 395 (1979).

In deciding which factors should be considered, it must be remembered that an administrative regulation which has been promulgated pursuant to RCW 49.60 should be construed liberally to accomplish the purposes for which it was adopted. *See generally Franklin County Sheriff's Office v. Sellers,* 97 Wash.2d 317, 327, 646 P.2d 113 (1982) (literal interpretation of WAC 162–16–020(2) inconsistent with RCW 49.60.020). The criteria proposed by Goodyear, however, would limit inquiry under WAC 162–30–020(5)(c) to a comparison of job functions. Such an approach is too restrictive. It ignores the fact that employment security is one of the most important attributes of any job.

Subsection (5)(c) was adopted to spare a woman the dilemma of choosing between work and family. WAC 162–30–020(2). In that regard, it is fully consistent with the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), which was enacted to " 'guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life.' " *California Federal Savings and Loan Ass'n v. Guerra,* 479 U.S. at 288–89, 107 S.Ct. at 693–94 (quoting Senator Williams, a sponsor of the PDA).

A woman who is reassigned to a less secure position after she takes a pregnancy leave has been placed at a serious disadvantage when compared to her male colleagues. Her status as an employee has been jeopardized because she chose to have a child. Thus, her new position is not similar to her former job.

### b. Business Necessity

■ The fact Goodyear did not provide Mrs. Johnson with a similar job is not the end of the matter. Goodyear may justify its actions by presenting "adequate facts concerning business necessity." WAC 162–30–020(5)(c).

(i) The term "business necessity" is not defined by the regulation. It has, however, been the subject of much litigation in disparate impact cases. In that context, one commentator has suggested that, to establish business necessity, an employer " 'has the burden of producing evidence that its employment practices are based on legitimate business reasons,' and of proving that legitimate goals are 'significantly served by' the practice at issue." D. Cathcart & R. Ashe, eds., Five–Year Cumulative Supplement to Schlei & Grossman's *Employment Discrimination Law,* 2d ed., 497 (1989) (quoting *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 997–98, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988)). Washington cases are in accord. *Shannon v. Pay 'N Save Corp.,* 104 Wash.2d at 730–31, 709 P.2d 799; *Fahn v. Cowlitz County,* 93 Wash.2d 368, 380–81, 610 P.2d 857 (1980). Applying those principles to this case, Goodyear must demonstrate two things to establish business necessity: that its decision to assign Mrs. Johnson to the new position was intended to achieve legitimate business goals; and that those goals were served in some significant sense by the decision Goodyear made.

By the time Mrs. Johnson called Dave Sturgis to notify him she had been released by her physician to return to work, Mr. Sturgis had decided to replace her with Dan Zyph. Mr. Sturgis was perhaps more candid than he realized when he told Mrs. Johnson he was unsure he had a job for her, and that she should call Jim Donaldson. To their credit, more senior officials acknowledged Goodyear's obligation to find a comparable position for Mrs. Johnson. It is clear that a serious effort was made to do so. After a number of discussions, Goodyear decided that the best solution was to create a new position. However, that decision was motivated by legal necessity, not business necessity. But for Mrs. Johnson's return from maternity leave, Goodyear would not have hired an office manager for the retread plant in July of 1989.

(ii) Goodyear contends the business necessity requirement of subsection (5)(c) has been modified by Washington's Family Leave Act, which authorizes an employee to take up to twelve weeks leave during any twenty-four month period to provide care to a newborn (or terminally ill) child.

RCW 49.78.030(1). Goodyear's argument is based upon RCW 49.78.070(1). Although that section requires an employer to provide a position to an employee who returns from family leave, the employer is accorded significantly more latitude in deciding which position to offer the employee than the employer is granted under WAC 162–30–020(5)(c).

 It is true that statutes which relate to the same subject matter should be considered together in ascertaining legislative intent. *See Bennett v. Hardy,* 113 Wash.2d 912, 926–27, 784 P.2d 1258 (1990). But that particular rule of statutory construction has limited applicability in this case. RCW 49.78.100 says, "Except as provided in this chapter, the rights under this chapter are in addition to any other rights provided by law." That provision is a clear statement by the Washington Legislature that it did not intend the Family Leave Act to restrict WAC 162–30–020(5)(c).

Besides, the Family Leave Act did not take effect until September 1, 1989. RCW 49.78.901. By then, Mrs. Johnson had been back at work for almost two months.

c. Conclusion

Mrs. Johnson lost a substantial measure of job security when she was assigned as the office manager of the retread plant. She became much more vulnerable to discharge than she would have been had Goodyear allowed her to return to her former job. Thus, her new position was not similar to the one she held prior to taking her maternity leave.

Furthermore, Goodyear has not justified its decision to reassign her. The new job was created to satisfy a legal obligation; business necessity was a secondary consideration. Given the magnitude of the losses which the Tire Center had sustained prior to July 10, 1989, and given the lack of objective need for an office manager in the retread plant, it was reasonably foreseeable that Goodyear's articulated business goals would not be served in any significant sense by its decision to create the new position.

The Court therefore concludes that Mrs. Johnson has proved, by a preponderance of the evidence, that Goodyear violated WAC 162–30–020(5)(c) by assigning her as the office manager of the retread plant upon her return from maternity leave.

*2. Breach of Company Policy*

 Mrs. Johnson never entered into a written contract of employment with Goodyear. "Traditionally, such employment relationships are terminable at will." *Gaglidari v. Denny's Restaurants,* 117 Wash.2d 426, 432, 815 P.2d 1362 (1991). However, a terminable-at-will relationship may be modified by statements which are made in employee manuals or handbooks. *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 230, 685 P.2d 1081 (1984). Modification can occur by either of two processes. *Gaglidari v. Denny's Restaurants,* 117 Wash.2d at 432–33, 815 P.2d 1362. The first is by creation of a contract. An employer may incorporate a manual into an offer of employment by both explaining the manual's terms and insisting that the employee abide by them. The employee, in turn, may accept the offer by acknowledging those terms and agreeing to adhere to them. If consideration is provided through actual employment, a contract exists. *Id.* at 432, 815 P.2d 1362; *Thompson v. St. Regis Paper Co.,* 102 Wash.2d at 228, 685 P.2d 1081. Alternatively, "[e]mployer obligations may arise ... when the employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and the employee relies thereon." *Gaglidari v. Denny's Restaurants,* 117 Wash.2d at 433, 815 P.2d 1362 (citing *Thompson v. St. Regis Paper Co.,* 102 Wash.2d at 230, 685 P.2d 1081). Whether a manual modifies the terminable-at-will relationship is a question of law. *Gaglidari v. Denny's Restaurants,* 117 Wash.2d at 432, 815 P.2d 1362; *Stewart v. Chevron Chem. Co.,* 111 Wash.2d 609, 612, 762 P.2d 1143 (1988).

a. Modification of Relationship

 It is undisputed that Goodyear's maternity policy is contained in a personnel manual, which provides in pertinent part:

At such time as the employee is no longer disabled due to pregnancy, she shall return to her former position, or at the sole option of the Company, to a position of like status and pay, without loss of service.

(Pl.'s Ex. 1. Field Personnel Manual § 7, at 3.) In 1987, Mrs. Johnson reviewed Goodyear's maternity policy with the person who was the manager of the Tire Center at the time. She then took a leave of absence which lasted for approximately one month. While she was gone, her position was filled by a temporary replacement. She resumed work as the office manager of the Tire Center upon her return.

In early 1989, Mrs. Johnson met with Jim Donaldson and Dave Sturgis to discuss a second maternity leave. While there is some dispute as to what the Goodyear officials said, the Court is satisfied that they promised no more than that which company policy provided.

Mrs. Johnson gave birth to her second child on May 18, 1989. When Dave Sturgis told her he was not sure he had a job for her, she attempted to call Jim Donaldson. Because she was unable to reach Mr. Donaldson, she contacted Howard Christman. He confirmed Goodyear policy, and assured her that she would be provided with a job.

In fact, Goodyear does not dispute that its officials repeatedly represented to Mrs. Johnson that she could rely on Goodyear's written policy concerning maternity leaves. Consequently, Mrs. Johnson's status as a terminable-at-will employee was modified by the terms of Goodyear's Field Personnel Manual, and Goodyear is bound by its representations to her.

b. Breach

■ The obligations created by WAC 162–30–020(5)(c) and the Field Personnel Manual are virtually identical. In the event Goodyear decided to assign Mrs. Johnson to a new position, subsection (5)(c) required the company to provide her with

"a similar job of at least the same pay." According to the Field Personnel Manual, Goodyear was obligated to give her a position of "like status and pay." The manual required no less than the regulation.

The Court has previously determined that Goodyear violated subsection (5)(c) by assigning Mrs. Johnson to a position which was more vulnerable to elimination because of a reduction of force. It follows, therefore, that Goodyear breached the obligations created by its own policies.[5]

*3. Discriminatory Discharge*

Mrs. Johnson was employed in her new job until December 27, 1989, a period of about five months. At that point, her position was abolished and she was laid off. In the State of Washington, it is an unfair practice for an employer:

To discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap.

RCW 49.60.180(2). A claim of employment discrimination may be based upon either of two theories: "disparate impact" or "disparate treatment." *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash.2d 675, 678, 724 P.2d 1003 (1986); *Shannon v. Pay 'N Save Corp.*, 104 Wash.2d at 726, 709 P.2d 799; *Fahn v. Cowlitz County*, 93 Wash.2d at 378, 610 P.2d 857. "Disparate treatment" occurs when an employer treats an employee differently than her peers because of some improper consideration. *See E–Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wash.2d 901, 909, 726 P.2d 439 (1986).

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court not only determined the order in which proof is to be presented in a disparate treatment case brought under Title VII of the Civil Rights Act of 1964, but also allocated the burdens of production. *Texas Department*

---

5. Goodyear has included no business necessity exception to the requirements imposed by its Field Personnel Manual. A decision to assign an employee to a dissimilar job upon her return

from maternity leave might be justifiable as a business necessity under WAC 162–30–020(5)(c), but still breach the obligations created by company policy.

*of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). As a result, it is now firmly established that the plaintiff must first prove a prima facie case of discrimination. If the plaintiff does so, the employer must then present evidence which suggests that it had legitimate, nondiscriminatory reasons for its actions. Should the employer sustain its burden of production, the plaintiff must demonstrate that the reasons given by the employer are a pretext for discrimination. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *Allison v. Housing Authority of Seattle*, 118 Wash.2d 79, 88–89, 821 P.2d 34 (1991). Although the burden of production shifts between the parties, the ultimate burden of persuasion remains at all times upon the plaintiff. She must prove intentional discrimination by a preponderance of the evidence. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. at 986, 108 S.Ct. at 2784; *Baldwin v. Sisters of Providence, Inc.*, 112 Wash.2d 127, 134, 769 P.2d 298 (1989); *Grimwood v. University of Puget Sound*, 110 Wash.2d 355, 363–64, 753 P.2d 517 (1988). The procedure established by *McDonnell Douglas* accomplishes at least two important objectives: it facilitates the orderly presentation of relevant evidence, and it progressively sharpens the inquiry into the often elusive question of the employer's intent. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. at 986, 108 S.Ct. at 2784.

RCW 49.60 does not provide criteria for deciding discrimination claims. *Allison v. Housing Authority*, 118 Wash.2d at 88, 821 P.2d 34. However, RCW 49.60 is patterned after Title VII. *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash.2d at 678, 724 P.2d 1003 (citation omitted). Consequently, the Washington Supreme Court has held that federal cases interpreting Title VII are "persuasive authority for the construction of RCW 49.60." *Id.* at 678, 724 P.2d 1003.

■ That principle has been applied consistently to claims of discrimination brought pursuant to RCW 49.60. In such cases, the order of proof, burdens of production, and ultimate burden of persuasion are the same under both Title VII and RCW 49.60. *See Allison v. Housing Authority*, 118 Wash.2d at 88–90, 821 P.2d 34; *Grimwood v. University of Puget Sound*, 110 Wash.2d at 362, 753 P.2d 517; *Shannon v. Pay 'N Save Corp.*, 104 Wash.2d at 726–27, 709 P.2d 799.

The first question, then, is whether the plaintiff has proved a prima facie case. A diligent search has failed to uncover any Washington decision which sets forth the elements of a prima facie case of discriminatory discharge. As a result, it is appropriate to review federal cases for guidance.

The Ninth Circuit has held that a prima facie case consists of the following elements: the plaintiff was within a protected class; she was performing her job well enough to rule out the possibility that she was fired for inadequate job performance; and the plaintiff's employer sought a replacement with qualifications similar to her own, thus demonstrating a continued need for the same services and skills. *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir.1988); *Sengupta v. Morrison–Knudsen Co.*, 804 F.2d 1072, 1075 (9th Cir.1986). Here, the first two elements are not in dispute. The third is. Goodyear denies that it had a continuing need for Mrs. Johnson's services after it abolished her position.

■ Although Goodyear is correct in arguing that Mrs. Johnson was not replaced when her position was abolished, Goodyear did retain Dan Zyph as the office manager of the Tire Center. The functions which Mrs. Johnson had performed as the office manager of the retread plant were divided between Mr. Zyph and Wayne Dawson. Thus, Goodyear did have a continuing need for the type of services and skills which Mrs. Johnson provided.

Since a prima facie case has been established, the burden shifts to Goodyear to articulate legitimate, nondiscriminatory reasons for its decision to abolish Mrs. Johnson's position. *Allison v. Housing Authority*, 118 Wash.2d at 88–89, 821 P.2d 34; *Shannon v. Pay 'N Save*, 104 Wash.2d

at 727, 709 P.2d 799. Goodyear argues that it made a good faith effort to increase production during the second half of 1989. Not only did it make Mrs. Johnson the office manager of the Retread Plant, but it added (at least) one other production worker. However, production and sales did not increase sufficiently to prevent significant losses. Because of continuing losses, substantial pressure was brought to bear on Dave Sturgis to cut expenses. In making cuts, Sturgis did not want to hurt production or sales. That meant eliminating one of the office managers. As between Mrs. Johnson and Dan Zyph, he thought Zyph was more valuable to Goodyear.

That explanation, if correct, is adequate to justify Goodyear's decision to abolish Mrs. Johnson's position. Consequently, she must "demonstrate that the proffered reason was not the true reason" for Goodyear's decision to lay her off. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. "This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256, 101 S.Ct. at 1095. Given Mrs. Johnson's theory of the case, she must prove, by a preponderance of the evidence, that her pregnancy leave was a "substantial factor" in Goodyear's decision to eliminate her job. *See Allison v. Housing Authority*, 118 Wash.2d at 96, 821 P.2d 34.[6]

The Court concludes that it was not. In arriving at that conclusion, the Court has carefully considered the significance of the comments which Dave Sturgis made to Mrs. Johnson, and the manner in which she was treated by Lane Bibb. With regard to the former, it is likely Mr. Sturgis would have preferred Mrs. Johnson to remain at home with her children instead of returning to work at the Tire Center. However, once he understood Goodyear's legal and contractual obligations, he made a good-faith effort to comply.

The matter of Lane Bibb is more serious. Mr. Bibb was employed as an assistant manager in the Tire Center for the first two months after Mrs. Johnson's return. He was then transferred abruptly. During the month prior to his transfer, Mr. Bibb made work unpleasant for Mrs. Johnson. He ordered her to work every Saturday (although he eventually allowed her to take one Saturday off), and he pressured her to perform physically demanding tasks.

Once Mr. Bibb left, such behavior ceased. There is no evidence that, after Mr. Bibb was transferred, Mrs. Johnson was required to work more Saturdays than her colleagues or that she was pressured to undertake tasks for which she was not physically suited. In fact, her immediate supervisor, Wayne Dawson, knew she had a back condition and instructed her not to lift heavy objects.[7]

In evaluating Mr. Sturgis's decision to eliminate Mrs. Johnson's position, the Court has also considered the financial condition of the Tire Center in December of 1989. By the end of the year, the Tire Center had lost in excess of three hundred thousand dollars. Mr. Sturgis's superiors brought substantial pressure to bear upon him to reduce losses by cutting expenses. As the Court has previously determined, the Tire Center (including the retread plant) could function effectively with just one office manager. From a business standpoint, it was not unreasonable to eliminate one of the two positions.

---

6. In *Allison*, the Washington Supreme Court rejected an employer's argument that, in an age discrimination case, RCW 49.60.180 requires the plaintiff to prove that she would not have been discharged "but for" her age. *Id.* 118 Wash.2d at 87–88, 821 P.2d 34. The Court then went on to hold that, where an employee alleges retaliatory discharge in violation of RCW 49.60.210, the plaintiff must prove that retaliation was a "substantial factor" in the employer's decision. *Id.* at 95–96, 821 P.2d 34. The Court reached essentially the same conclusion in *Wilmot v.*

*Kaiser Aluminum & Chemical Corp.*, 118 Wash.2d 46, 70–71, 821 P.2d 18 (1991), holding that an employee who claims he was discharged because he applied for worker's compensation benefits must prove that his application for such benefits was a "substantial factor" in his discharge.

7. Had Mr. Dawson known of Mr. Bibb's instructions to Mrs. Johnson, it is likely that he would have brought the matter to the attention of Dave Sturgis.

Both Dan Zyph and Connie Johnson were competent office managers. However, Dan Zyph could perform physical tasks which were beyond her ability, and had demonstrated the ability to sell merchandise. As a result, he was the more valuable employee. The Court concludes that Dave Sturgis did not discharge Mrs. Johnson either because she had taken a pregnancy leave or because of her gender.

*4. Wrongful Discharge*

The Washington Supreme Court has ruled that an employee who has been wrongfully discharged in violation of public policy may bring a cause of action in tort against her employer when no statutory remedy exists. *See Farnam v. Crista Ministries*, 116 Wash.2d 659, 668–669, 807 P.2d 830 (1991) (citing *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984)). Until recently, the Court had declined to decide whether the tort of wrongful discharge extended to acts of discrimination for which RCW 49.60.030(2) provides a remedy. *Bennett v. Hardy*, 113 Wash.2d at 925–26, 784 P.2d 1258; *Grimwood v. University of Puget Sound*, 110 Wash.2d at 367, 753 P.2d 517. Although the Court has yet to specifically resolve that question, it has indicated that the answer will depend upon the language of the statute and legislative intent. *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 118 Wash.2d 46, 54, 821 P.2d 18 (1991).

Mrs. Johnson has made no effort to undertake the analysis required by *Wilmot*, nor has she suggested that the tort of wrongful discharge provides a remedy not available under RCW 49.60.030(2). As a result, she has abandoned her claim of wrongful discharge, and it will be dismissed.

DAMAGES

By reassigning Mrs. Johnson as the office manager of the retread plant upon her return from maternity leave, Goodyear placed her in a position which was much more vulnerable to elimination. The Court specifically finds that it is unlikely she would have been discharged in December of 1989 had Goodyear not violated WAC 162–30–020(5)(c) and breached the promises contained in the Field Personnel Manual. Although Mrs. Johnson's discharge was not discriminatory per se, it was a direct (and virtually inevitable) result of Goodyear's prior wrongful acts.

*1. RCW 49.60*

The Washington legislature has provided a comprehensive set of remedies for an employee who has been injured by an unfair labor practice. RCW 49.60.030(2). In exercising the discretion conferred by that statute, *see Davis v. Department of Labor and Industries*, 94 Wash.2d 119, 124–25, 615 P.2d 1279 (1980), the Court concludes that Mrs. Johnson is entitled to the following:

a. Back Pay

RCW 49.60.030(2) authorizes the Court to compensate Mrs. Johnson for her "actual damages." That includes back pay. *See Xieng v. Peoples National Bank*, 63 Wash.App. 572, 584, 821 P.2d 520 (1991).

Mrs. Johnson was discharged on December 27, 1989. At that time, she was being paid $2047.00 per month, plus medical and retirement benefits. Dr. Clarence Barnes, an expert called by Mrs. Johnson to testify regarding economic damage, determined that she would have earned at least $61,857.00 between the date of her discharge and the present had she continued to work at the Tire Center as an office manager.

Mrs. Johnson has applied for a number of jobs since she was discharged, but has not received an offer which she deems suitable. Instead, she has stayed at home with her two pre-school children. The Court finds, however, that she could have found a position which paid at least five dollars per hour within three months of discharge. That being the case, it would be inequitable to require Goodyear to reimburse her the entire amount she would have earned had she remained at the Tire Center as an office manager.

Mrs. Johnson is awarded the sum of forty-one thousand eighty dollars ($41,080.00)

as back pay. That figure is based upon the following calculations:

(i) During the twenty-five months between her discharge and the trial, Mrs. Johnson's average salary would have been two thousand four hundred dollars ($2,400.00) per month. That figure includes medical and retirement benefits, and salary increases.

(ii) Mrs. Johnson would have earned seven thousand two hundred dollars ($7,200.00) at the Tire Center during the first three months after her discharge.[8]

(iii) Mrs. Johnson would have earned fifty-two thousand eight hundred dollars ($52,800.00) at the Tire Center during the next twenty-two months. However, she could have earned eighteen thousand nine hundred twenty dollars ($18,920)[9] from a different employer during that same period had she been willing to accept an entry level position. The difference between the two is thirty-three thousand eight hundred eighty dollars ($33,880.00).

(iv) Seven thousand two hundred dollars (the first three months) plus thirty-three thousand eight hundred eighty dollars (the next twenty-two months) equals forty-one thousand eighty dollars ($41,080.00).

b. Emotional Distress

■■■ As part of her actual damages, Mrs. Johnson may recover for mental anguish which she suffered as a result of her discharge. See Cagle v. Burns & Roe, Inc., 106 Wash.2d 911, 917–18, 726 P.2d 434 (1986); Dean v. Metropolitan Seattle–Metro, 104 Wash.2d 627, 640–41, 708 P.2d 393 (1985). In that regard, she has presented evidence which indicates she has experienced depression, and that the trauma of her discharge has led to an increased sensitivity which causes her to become upset more easily than before.

The Court notes that neither party offered a professional assessment of Mrs. Johnson's present emotional state, which makes it somewhat more difficult to assess the extent of her injury. However, after listening to the testimony of the witnesses and observing Mrs. Johnson's demeanor, the Court is satisfied that the anguish which she suffered has not led to permanent (or even lasting) psychological damage. The Court therefore concludes than an award of five thousand dollars ($5,000.00) will adequately compensate Mrs. Johnson for emotional distress.

c. Reinstatement/Front Pay

■■■ The Court may order either reinstatement or front pay to correct the lingering effects of Goodyear's unfair employment practice. See Hayes v. Trulock, 51 Wash.App. 795, 802–03, 755 P.2d 830 (1988). In this case, reinstatement would be inappropriate because it is likely Mrs. Johnson would be faced with a hostile working environment upon her return. Id. at 802, 755 P.2d 830. Since the Court declines to order reinstatement, it must provide compensation for wages which would have been earned but for Goodyear's unfair employment practice. Such compensation is usually referred to as "front pay." Id. at 802, 755 P.2d 830. It is a form of actual damages because it is designed to redress the continuing effects of an unlawful act. See Xieng v. Peoples National Bank, 63 Wash.App. at 583, 821 P.2d 520.

As the Hayes court observed, an award of front pay often represents "the difference between what the employee would have earned from h[er] former employer and the amount, if any, [s]he could expect to earn from h[er] new employer." 51 Wash.App. at 802, 755 P.2d 830 (citation omitted). Thus, the calculation of front pay may depend upon the interaction of two factors: the period of time the employee would have worked for her former employer but for the wrongful act, and the earnings which the employee can reason-

8. Goodyear must pay Mrs. Johnson's full salary for each of the first three months after her discharge—in other words, the period of time it would have taken her to find an entry level job had she chosen to look for such a position.

9. Five dollars ($5.00) per hour × 40 hours per week × 4.3 weeks per month × 22 months.

ably expect to make from a new employer. 51 Wash.App. at 802, 755 P.2d 830.

■■ In considering the first factor, the Court notes the Tire Center has lost substantial sums of money since it opened for business at its present location. Although it is losing less money now than it did in years past, it has yet to become profitable. The Court does not believe Mr. Christman was posturing when he said that Goodyear will decide within the next six months whether to close the Tire Center. In view of the Tire Center's tenuous existence, Mrs. Johnson could not reasonably expect to have remained employed at the Tire Center more than twenty-four months from the date of the trial.

The second factor involves a determination of Mrs. Johnson's potential for future earnings in another job. Because she remains unemployed, it is difficult to make that determination.[10] However, there is no reason to believe she would have made less than eight hundred sixty dollars per month in another position.

Mrs. Johnson is awarded the sum of thirty-six thousand nine hundred sixty dollars ($36,960.00) as front pay. That amount represents $1540 per month (the difference between what she was earning and what she could be earning) multiplied by twenty-four months (the period of time over which she could reasonably expect to remain employed at the Tire Center).

### d. Costs/Attorney Fees

Mrs. Johnson is awarded the costs of this action, including reasonable attorney fees. RCW 49.60.030(2).

### 2. Breach of Implied Contract

■■ "[T]he purpose of compensatory damages is 'to put the injured party in as good a position as he would have been put by *full* performance of the contract.'" *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207,

1217 (9th Cir.1983) (interpreting Washington law). *See Eastlake Constr. Co. v. Hess,* 102 Wash.2d 30, 39, 686 P.2d 465 (1984). The damages awarded under RCW Ch. 49.60 accomplish that objective. Thus, the Court will award nothing further to Mrs. Johnson as a result of Goodyear's breach of the promises contained in its Field Personnel Manual.[11]

IT IS HEREBY ORDERED:

1. Connie F. Johnson is granted judgment against Goodyear Tire & Rubber Co. on her claim that Goodyear violated WAC 162–30–020(5)(c).

(a) She is awarded the sum of forty-one thousand eighty dollars ($41,080.00) as back pay;

(b) She is awarded the sum of five thousand dollars ($5000.00) for emotional distress;

(c) She is awarded the sum of thirty-six thousand nine hundred sixty dollars ($36,-960.00) as front pay; and

(d) She is awarded the costs of this suit, including reasonable attorney fees. Provided, counsel for Mrs. Johnson shall file a verified request for costs and attorney fees within fourteen days of entry of this order. The request shall be supported by schedules which describe in detail both the costs incurred and the work performed on Mrs. Johnson's behalf. Copies shall be served upon Goodyear's counsel. Any objection to the sum requested must be filed within ten days of service. The question of costs and fees will be decided without oral argument unless a party notes the matter for hearing.

2. Connie F. Johnson is granted judgment against Goodyear Tire & Rubber Co. on her claim that Goodyear breached the promises contained in its Field Personnel Manual regarding maternity leave. As explained above, she is awarded no damages based upon this judgment.

---

**10.** The record suggests that Mrs. Johnson is a talented, conscientious worker. Had she been willing to accept an entry-level job, it is likely she would have progressed to more responsible positions, just as she did with Goodyear.

**11.** In any event, Mrs. Johnson would not have been entitled to recovery for emotional distress as a result of a breach of an implied employment contract. *Gaglidari v. Denny's Restaurants, Inc.,* 117 Wash.2d at 440–48, 815 P.2d 1362.

3. Connie F. Johnson is denied judgment on her claim that Goodyear Tire & Rubber Co. discharged her in violation of RCW 49.60.180(2). That claim is dismissed with prejudice.

4. Connie F. Johnson is denied judgment on her claim that Goodyear Tire & Rubber Co. discharged her in violation of public policy. That claim is dismissed with prejudice.

5. Any remaining claims brought by Connie F. Johnson against Goodyear Tire & Rubber Co. are dismissed with prejudice.

IT IS SO ORDERED. The Clerk is hereby directed to file this opinion and furnish copies to counsel. Upon resolution of the question of costs and fees, judgment is to be entered and the file closed.